My name is Larry Bagsby. I'm here on behalf of Appellants Stephen and Sandra Lovelace. Of the two claims before the court, I'd like to begin with the FMLA retaliation claim. This was a claim where the district court relied virtually exclusively on temporal proximity and in doing so excluded what the plaintiff's theory of the case was, and that was that this is a cat's paw liability case. Counsel, could you speak up just a little bit more, maybe bend the mic a little bit closer to you? I'm sorry. Go ahead. What's the evidence of a cat's paw operating in this case? The two supervisors that controlled my client's position were two individuals by the name of Barnes. One was a Barnes employee. One was a Wash U employee. And I set out very specifically in the record a section of how they deal with each other and talk to human resources when it comes to the hiring and firing of employees. How was it they enlisted, as it were, somebody else to act on their behalf? Well, you can see through the email evidence, as well as their own deposition testimony, that they knew that they had to have the stamp of approval, essentially, just essentially a rubber stamp of a man by the name of Bob Bartuski. When you look at the deposition testimony of Mr. Bartuski, Mr. Bartuski himself conceded that he did not know why he was firing my client. He was looking to Ms. Sprinkley and Ms. Goldberg to tell him, what do I say to Sandra Lovelace if she calls me and asks why she's being fired? Mr. Badgley, even if cat's paw action in terms of the other defendants using that individual, what's the proof that those individuals had a discriminatory animus and conducted themselves on the basis of something in violation of the law? Just so I'm clear, Your Honor, you're referring specifically to Goldberg and Sprinkley? Yes. Okay. Dating back to February 9th, while my client was still out on her family medical leave, my client had to send them an email saying she would not be coming back before the entire lapse of her FMLA leave, which was scheduled to be March 4th. She had gone through a series of progressive treatments trying to deal with her physical issue, and then 12 days before her leave was going to lapse, she was required to undergo back surgery. There's an email exchange on that date between Sprinkley and Goldberg where Sprinkley is on time because of some physical issue. The record is supplemented by Sprinkley's deposition where she says in that period of time, Sprinkley was acting on the belief from rumors she had heard that my client was faking her FMLA leave despite undergoing surgery. Goldberg then responds to that email on the same day and says, I'm fine with her burning up her leave. If she doesn't come back here on the 4th, she's fired. In addition to that, my client does come back on March 4th and begin to work with work restrictions, physical restrictions that the doctors had imposed. When she was using her vacation leave at that point, is that the point? She did have enough vacation leave to cover the full FMLA leave. But in mid-April of 2015, so this is... She received the FMLA leave she requested, is that correct? Yes. But when she returns on March 4th, it is with work restrictions. In mid-April of 2015, Paula Goldberg sits down with my client for what was supposed to be a performance appraisal review. That entire meeting was essentially an interrogation as to why my client needed these accommodations because Goldberg didn't understand the necessity of it. She didn't like the inconvenience of it. She didn't believe the medical expenses that my client said she incurred as a result of the surgery. The issue of her performance appraisal was never even addressed. It was nothing but a criticism of why she had to take the FMLA leave. So going back to your question about what is the particular evidence of animus between Brinkley and Goldberg, those are the two key ones. Well, it's not just animus in the abstract. It's not just that they may not like each other or they may not have liked her, but the connecting and most important thing is to discover that they were making decisions on the basis of something the law prohibits and taking actions that the law prohibits. Correct. And one thing that just jumps out in this case is that as of May 28th, 2015, when my client's performance appraisal is completed, she's meeting and exceeding all requirements as she had in the past 12 years. She has no performance issues whatsoever as of May 28th. On July 10th, Paula Goldberg sends an email to Sandra Sledge and Human Resources telling her and this is her words, this is Goldberg speaking, I believe that I have enough evidence right now to discharge her, Sandra Lovelace, but I understand there's a process. Sandra Sledge from HR responds to that email saying, you need to keep addressing her accommodation issues in addition to any performance issues that you're now raising with me. One minute later, literally one minute after Goldberg had said I've got enough to send Sandra Lovelace packing, even though her performance appraisal on May 28th indicated there was nothing, Goldberg sends an email to Brinkley saying two words, I win. What was the date? July 10th. This is three weeks before her ultimate discharge would happen. What's the significance of the July 31st incident? On July 31st, that's really a culmination of events that started happening. And it's important to put this in the factual context so the court could appreciate it. I know you're on the outside looking in to see how these doctor teams and hospitals are set up. The medical assistant position, if you have a permanent assignment to a physician, you are likely there for life. You will never be moved again. When Sandra Lovelace came back from her FMLA leave, Paula Goldberg did not and refused to assign her to a permanent physician's team. She was assigned this transitory position where she may be working with three different doctors in a given week. So in July, what happens is there are four physician's teams that are demanding a full-time medical assistant like my client, Sandra Lovelace. That situation had never occurred before. Four doctors, four different teams are requiring and demanding a full-time medical assistant like my client. That's what she does. Two of those four, one was named Dr. Singh, the other was named Dr. Lockhart, had been promised that they would get Sandra. But Goldberg would not assign her to either one of those two teams. Both of those doctors were specifically asking for Sandra Lovelace and Goldberg would not assign her there. The reason that is significant is that it is in the first week of July, under our theory of the case, that Goldberg was under the pressure to find a way to discharge Sandra Lovelace. Because again, as a reminder, May 28, 2015, there are no performance issues with Sandra Lovelace. On July 10th, she sends that email to Sandra Sledge in HR and says, I've got enough to fire her. But I know there's a process. There was no evidence to fire her. So between Goldberg and Brinkley, between July 10 and July 31, they are out creating reasons to discharge her, actually fabricating reasons to fire her. So what's your factual description of the July 31st incident? Because it seemed to play a part in the ultimate termination decision. If the employer's decision as to why my client's discharge occurred is to be believed, it's the single issue of behavioral issues on July 31, which I do not believe. My client was methodically being set up with concocted evidence all the way up to that July 31 meeting, and my client knew it. So when she walked into that meeting, she knew what was going on. She had reported both people in that meeting, her immediate supervisor Brinkley and the HR rep, Sandra Sledge, for retaliating against her for reporting claims of discrimination. Before you run out of time, counsel, I'm sorry to interrupt, but you made reference earlier to the remark to the effect that I win. I'm not sure why you draw an inference of animus from that, because it's a perfectly innocent explanation. Is there not, for what that meant? Actually, it doesn't fit in your case, because she didn't win in the sense that she got someone to agree to fire her. Isn't that right? In the light most favorable to the plaintiff, there is an alternative interpretation for that, and we're here on a summary judgment. What would it be? She is telling, she had copied, this is Goldberg speaking, I believe I have enough to fire her right now. That's her message to Sandra Sledge and HR. She copies Brinkley on that. As if there had already been a communication between Goldberg and Brinkley about what Goldberg was going to tell Sledge. She then, again, within one minute of getting the response back from Sandra Sledge, tells Brinkley, I win. And I do would like to reserve my time. I do have quite a bit of rebuttal. Thank you. Thank you, Mr. Baxby. Mr. Brimmer. Good morning, judges. Morning. I'm going to argue on behalf of both Appellees, counsel for both of them are here in the courtroom. The undisputed, indeed admitted facts about plaintiff's workplace. I'm sorry, counsel, could you speak up just a little bit? You can raise the podium perhaps. It's up all the way. If you like. The undisputed, indeed admitted facts about plaintiff's workplace behaviors on July 31, provide an overarching basis for this court to affirm. Those facts, nowhere mentioned in plaintiff's opening argument or in any reply brief because none was filed. And I listened very carefully to counsel's opening and answer to the court's questions. He didn't really go into those facts. And I'm going to go through them because they're critical. And those facts are case dispositive in our view for four separate reasons. First, plaintiff sworn deposition admissions that on that date, she refused to engage in any discussions with her supervisors about personnel or performance related issues, conclusively establishes that she was terminated for a legitimate non-discriminatory reason, namely that she was an unmanageable employee, not meeting the legitimate expectations of her employer. We cite the Smith case in our brief for that proposition. Secondly, I guess it'd be conclusive unless you can come up with some address what happened on that date or those reasons, that specific reason for her termination. Her termination decision was limited to the events of that date. And if I might, there's a second reason why this is case dispositive. The reasons she gives for failing to engage in any discussions with her supervisors about her performance was that she has made an HR complaint. That is a blatant violation of this court's settled precedence on the so-called insulation doctrine. An employee cannot insulate herself from her own disciplinary warnings by then first began to engage in alleged protected activity. That is an abuse of the anti-retaliation remedies as this court has made clear in numerous decisions. They're set out in our argument point five. Third, those undisputed events of July 31 were classic intervening events that broke any causal chain from any purported protected activity or involving any of the other things that counsel mentioned in answer to your questions about July 31. Any causation with respect to that is clearly broken as a matter of the settled law of this circuit. And for that proposition, we cite two important MHRA cases. This applies both to the federal and the state claim. And those cases are this court's in-bank decision in Keele as well as the Missouri Court of Appeals decision in Shore. An intervening event like exactly what happened that is undisputed on July 31 forecloses any causation from any violation of either statute. And finally, whereas here Bob Barczewski's termination decision was undisputedly true. She was refusing to engage in workplace discussions. Cat's paw liability cannot exist for that reason alone. Cat's paw liability is when nefarious actors who are motivated by some animus try to persuade the decision maker by some sort of falsified record, falsified facts to make the determination decision. Here, his stated reasons were undisputedly true. Now, our brief sets out a number of points why each of the claims and subclaims cannot stand for separate reasons beyond what I have just said. But this overarching basis, namely, that what happened on July 31 was indisputable, truly forecloses her claims for those four reasons I have given. They're set out in various points in our brief, but I wanted to clarify them for you in this argument. And if I might, I'd like to review what the truly undisputed evidence is as to what occurred on July 31, which has nowhere been addressed by plaintiffs, whether in writing in this case or orally. And those facts are set out on pages 11 and 12 of our brief. We take our proffered material undisputed facts we did below primarily based on plaintiffs' own sworn deposition testimony. That's the basis for our proffered facts. Now, I understand that below every one of those was disputed, but those disputes were improper under this court's Camfield-Tyers decision and its subsequent cases. That's the case and line of cases where this court has made it very clear that a non-movement can't try to raise a genuine issue of fact by contradicting her own sworn deposition testimony. And that's exactly what's going on here. So these are the facts from her own testimony. She admits that she was called into the meeting because her supervisors were there to coach her. And immediately upon being shown this checklist, which was to be constructive criticism for her and to give her confidence that she could perform the duties of her job, she became combative and she said, I know how to do my job. And then she started crying, all undisputed from her own testimony. And she claimed that she had been called a racist, which is untrue. Nobody ever called her a racist. We have that in undisputed evidence. And then she withdrew that inference from the criticism that was advanced against her. Pardon me again, Judge? She withdrew that inference that that was what was being said about her from the criticism that was made of her. Yeah, well, the facts on that are, though, that, I mean, Goldberg hears that this comment, the so-called butcher comment, might have been made. She, as a supervisor, has to investigate that. She can't ignore that. So she asked. Anyone complained about it? Pardon me? Did anyone complained about it? Yes. She heard that from Dr. Van Tine, that plaintiff had made the comment. So when they were meeting with her on July 13, Goldberg asked Sandy Lovelace, did you make that comment about Angie Butcher not wanting to work with white people? And she said she did not make that. And Goldberg's response was, and there's nothing inconsistent in plaintiff's testimony about this. Goldberg's response was, I'm happy to hear that. You have denied it. That's all I need to know. Let's move on. And plaintiff said, I am not moving on. So she was not accused of having made a racist statement in that conversation, nor was she at any time thereafter. By the way, that's another reason why any complaints she made to HR after she had received the disciplinary warning were in bad faith, because she repeated in her complaints that I have been accused of being a racist when that is false. And she admitted at her deposition that no one ever accused her of that. Well, she said they didn't use the word. But I still think that the words on the paper may not give a true picture of the confrontation. But her complaint would be rather clear that she did draw the inference that that was what was being said about her, or at least there's evidence that that from which a fact finder could conclude that she drew that inference and maybe not for no reason. I don't think inferences with respect, Your Honor, really apply here because her complaint to HR was specifically, I have been accused of being a racist. And then. Well, wasn't that the whole point of asking her about? Was to determine whether she was acting in communicating with coworkers on the basis of. Her complaints to HR was that Goldberg and Frankly had accused her of being a racist, but they never did. And I asked her in deposition, did they ever accuse you of being a racist? She said no. Van Tine mentioned to Goldberg or Brinkley that he had heard this comment be made, but he didn't say she was a racist either. And she sued him for defamation about that, and that case was thrown out of court and that was affirmed because it's not defamatory and it did not happen that way. But if I may go back to her admissions about the events of July 31, because again, we've given all kinds of reasons why this case can't go forward, but this one cuts across everything. And then at that meeting, she and again, she admitted she was not called a racist at that meeting. And there was no conversation about the so-called butcher comment at that July 31 meeting. And she specifically testified to this. This is a direct violation of this court's pronouncements on the insulation doctrine and abuse of the anti-retaliation remedy. She said, quote, these are her own words. Because I had filed a formal complaint at HR, I felt it was inappropriate to discuss personnel or performance issues given the fact that I had filed this complaint and it was pending at the time. The very notion of discussing performance related issues was just too upsetting to me to continue the conversation. Closed quote. That is a direct refusal to engage in critical discussions that must occur in the workplace. She was, by her own admission, an unmanageable employee who could not meet the employer's expectations, which was exactly the reason why she was terminated. But it didn't end there. Then we have the further incidents when she went back to her cubicle. So she said, I can't continue with this meeting. I need to leave. And so she was politely allowed to leave. And then back at the cubicle. She was not leaving. She was working at her computer and she was doing other things there. And then after some time had passed, Brinkley went to check on what was going because apparently what was going on because we were concerned she wasn't, in fact, leaving. And then when Brinkley arrived, plaintiff backed up dramatically, threw herself against her desk. Now I'm going to quote from her own words, sworn testimony, how she described it. Quote, I have never jumped so high in my life and I twisted around and I did fly up against the desk. And then there is evidence also from disinterested third party employee witnesses who were there is that she said to Brinkley, get away and don't touch me. And that is undisputed. Those are undisputed facts. Plaintiff may try to do it by her affidavit, but the law is if you've got a disinterested third party who gives that kind of explanation to the employer, the employer is allowed to rely on that as a source of information, regardless whether plaintiff in her conclusory affidavit might want to dispute everything. And we have the affidavit of one of the coworkers, Natalie Taylor, who said that plaintiff's conduct at the cubicles there was very unprofessional and disruptive. She was, quote, very aggressive, very loud and seemed to be out of control. Close quote. This is the kind of information that was truthfully passed on to Bob Barczewski. He was not involved in any of this stuff that my counsel has described. He didn't know about it. He wasn't involved in any of that stuff. But the information he received was about the behaviors that are undisputed that occurred on that date. And for those four separate reasons I've given, this case can't go anywhere. And the summary judgment should be affirmed. Now, as I explained, we have given other reasons in our brief why separately each of the federal and state claims must be, there must be affirmance of the summary judgment on each of them. And those are numerous grounds based on settled lines of authority from this court and from where replicable Missouri case law as well. My time is about up. I'd be happy to answer any further questions the court may have. I see none. Thank you, Mr. Brimmer. Thank you. Mr. Bagsby, your rebuttal, please. I would like to respond to this insulation doctrine argument and do it on a timetable that would illustrate why it would not apply here. Again, it is on July 10th, 2015, Goldberg sends that email to Sandra Sledge saying, I've got enough to fire right now, even though she doesn't. She doesn't have any reasons to fire her. On July 13th, my client is called into this meeting with Paula Goldberg and Dee Brinkley and confronted with that statement about did she yell out in clinic, don't hire Angie Butcher. She doesn't like working with white people. She immediately took that as an affront because Goldberg was yelling at her. Did you make that statement in clinic, in front of patients, in front of all the other employees? That's what I meant when you said on the paper, you can't tell what the manner was. Correct. My client said she's not going to let it go because they were not letting it go. They were, she was, my clients being yelled at for having made that statement. The very next day, July 14th, my client then goes to Sandra Sledge and human resources and says, I am unfairly and improperly being accused of being a racist and yelling out a racist statement in front of the clinic. And it's Goldberg and it's Brinkley who are making this accusation. Apart from that, I am now being criticized for employment performance issues that are not employment performance issues. I'm not being allowed to go to doctor's teams where the doctors are specifically asking for me to be assigned to their teams. That happens on July 14th and she says to Sandra Sledge, I think this is because I am being, I have these accommodations from my FMLA leave. I'm being criticized for having faked my FMLA leave. And now I've got to deal with this. She waits to get a response back from Sandra Sledge. She gets none. So she goes back to Sandra Sledge seven days later on July 21st and says, what's going on? Why aren't you investigating this? She still gets no response. She goes over the head of Sandra Sledge and human resources on July 24th, seven days before she's going to be discharged and says to the supervisor, Leanne Stewart, I want you to investigate what's going on with my supervisors because I'm getting no relief from Sandra Sledge. So when she walks in, my client walks into this meeting, Dee Brinkley, who she complained about and was making accusations of discrimination against on July 31st, when she walks into that meeting, guess who's sitting there? Dee Brinkley and Sandra Sledge, the two people she has gone to the head of resources for to complain that she is being discriminated against. So she starts crying. That is the behavioral issue that the employer supposedly discharged my client for, crying because she's being forced into a meeting where she has made complaints against the specific people who are now going to hold this meeting. And I see that I am out of time unless the court has other questions. Thank you, Mr. Baxby. Thank you. Court wishes to express our appreciation to both counsel for your presence and the argument you provided to the court today. The briefing which you've submitted, we will take the case under advisement.